27 C.C.P.A.(Patents)

### HULL v. SMITH (three cases).

Patent Appeals Nos. 4210–4212.

Court of Customs and Patent Appeals.
Feb. 5, 1940.

Rehearing Denied March 20, 1940.

JACKSON, Associate Judge.

These are appeals from decisions of the Board of Appeals of the United States Patent Office in three interference proceedings, affirming decisions of the Examiner of Interferences awarding priority of invention to the senior party Smith.

The interferences involve three applications of Smith as follows: Serial No. 55,-262, filed September 9, 1925, involved in Interference 66,017, Appeal No. 4210; Serial No. 13,145, filed March 5, 1925, involved in Interference 71,931, Appeal No. 4211; and, Serial No. 88,558, filed February 16, 1926, involved in Interference 71,-932, Appeal No. 4212.

One application of the appellant, serial number 156,713, filed December 23, 1926, is involved in all three interferences.

The burden of proof is upon appellant, the junior party, to establish priority by a preponderance of the evidence; if such burden is not met by appellant, priority must be awarded to the appellee.

The general subject matter involved is electric discharge tubes which may be used for rectifying alternating currents.

The last two interferences mentioned above, namely, numbers 71,931 and 71,932, are outgrowths of Interference 66,017 which was declared April 4, 1933. After considering various motions filed in Interference 66,017 for the purpose of adding Smith applications to the interference, the Patent Office decided that such applications should be added, and declared the two said additional interferences on December 26, 1935.

Voluminous testimony was taken and a great number of exhibits are before us.

By stipulation the three interferences were consolidated for purposes of appeal to this court, and were presented here in a consolidated transcript of record. They will be decided in a single opinion.

Harrison F. Lyman, of Boston, Mass. (A. D. Salinger, of Boston, Mass., and William G. Gartner, of Schenectady, N.Y., of counsel), for appellant.

Elmer J. Gorn, of Newton, Mass., and Delos G. Haynes, of St. Louis, Mo., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

Appeal No. 4210—Interference No. 66,017.

This interference relates to a thermionic discharge device of the gas filled type having a cathode in the form of an enclosure which is interiorally coated with an emissive material and which cathode has an opening for the escape of electrons, the size of said opening being but a small fraction of the area of the inner surface of the cathode. Seven counts are involved, of

which counts 1, 3 and 5 are illustrative, and which read as follows:

"1. An electrical discharge device comprising an envelope provided with electrodes including an anode and a cathode, said cathode containing a cavity having an opening for the escape of electrons, the size of which is a small fraction of the area of the inner surface of the cavity, a solid activating material in said cavity, and a material contained within said envelope which at the operating temperature of said device has a gas pressure within the range of about one to one hundred microns of mercury, said cathode and anode being spaced apart to permit ionization therebetween and said cathode operating at a temperature at which rectification is dependent upon thermionic emission and providing thermionic emission to maintain the discharge between cathode and anode.

"3. In an electrical discharge device the combination of an envelope, electrodes therein including a cathode, an attenuated gas therein at a pressure sufficiently high to permit of substantial ionization, said cathode comprising an enclosure with one or more openings, a solid thermionic material in said enclosure, means for suppressing heat loss from the exterior of said enclosure, and a radiation heater for heating said enclosure to an electron-emitting temperature.

"5. An electrical discharge device comprising a sealed envelope containing electrodes including an anode and a thermionic electrode having a cavity of large internal surface provided with a relatively small opening for the passage of electrons from the interior of said cathode to said anode to maintain the discharge between said cathode and anode, and an alkaline earth oxide coated on the interior walls of said cavity, said walls being positioned in shielding relation to one another, a filamentary heater for said cavity and an attenuated gas in said envelope at a pressure sufficiently high to neutralize space charge."

All of the counts herein are copied from the Hull application. The sole question for decision is, as stated in the brief of appellant, whether the Smith application involved in this interference discloses an operative embodiment of the subject matter of the counts.

The record shows that appellant built several tubes, hereinafter referred to, al-legedly in accordance with appellee's disclosure and appellant states that the case was tried on the disclosure shown in figure 1 of appellee's application, serial number 55,262. This figure may be described as showing a conventional glass envelope. In the envelope there is a single gas or mixed gases readily ionizable, which may comprise mercury vapor or vapor of an alkaline metal (preferably caesium), the vapor being derived from a small quantity of liquid or solid material incorporated in the envelope. When employing mixed gases the second gas comprises an inert, monatomic gas such as helium or other gas which when not ionized does not greatly hinder the passage of electrons. Within the envelope or tube there are a cathode and two anodes. The cathode is a cylindrical structure with a closed bottom and an open top covered by a perforated disc preferably formed of molybdenum. The interior of the cathode is coated with a material which emits the electrons thermionically.

The cathode is mounted inside a heavy nickel cup, the lower part of which is spaced from the bottom of the cathode to form a chamber in which is mounted a heating filament, of tungsten or molybdenum, to heat the cathode for starting purposes. A light metal shield surrounds the side walls of the said cup, serving to minimize loss of heat from the cathode.

One anode is in the form of a disc directly opposite the disc of the cathode, while another anode is in the form of a cylinder, the lower part of which extends below the top of the said light metal shield, this latter anode being located out of direct line with the opening in the closure disc of the cathode.

According to the application of appellee, the operation of the device shown by said figure 1, which has just been described, is started by first heating the cathode with the heating filament and then applying a suitable potential for starting. During the operation the electronic discharge flows from the interior of the cathode through the opening in the disc and thence to the two anodes alternately during alternate half-cycles. The gaseous material contained in the tube is vaporized to some extent by the heating filament and to a maximum degree by the heat caused by the electronic discharge. The anodes are "non-heated" and current flowing from the heated cathode to the "non-heated" anodes re-

sults in the device being a "rectifier" for changing alternating current to direct current.

The use of activating material on a cathode is not new with either party, and the gist of the invention here appears to be a construction of the cathode in such a form that the activating material will not be lost from the surface of the cathode as readily as in the prior art. In the inventions here, therefore, the life of the tube is lengthened.

In order to support appellant's contention that the Smith application does not disclose a device operable in accordance with the count, a number of tubes were built by an employee of the General Electric Company, assignee of appellant's involved application, in accordance with sketches furnished to him by the appellant. It is not necessary to describe in detail the structure of said tubes except to state that they comprise, for the most part, cathode discs of the same thickness as "the heavy metal cup," and an aperture of .040″ in diameter in the center of the disc. One of the said tubes contained a 20 mil cathode closure disc with a 20 mil aperture; another contained no aperture at all; and a further tube was constructed with the cathode made of 20 mil material, the cathode cup of 35 mil material and the closure disc of 60 mil material, the cathode disc being provided with a 40 mil aperture and also a 1/8″ aperture which could be opened or closed.

The above-mentioned tubes were tested ex parte by a witness for the appellant who was duly qualified as an expert. According to his testimony none of the tubes would operate in the manner intended by appellee's disclosure except the one last described above. This tube, it was testified, did not operate when the 1/8″ aperture was closed but did operate when the said aperture was opened.

Counsel for appellee was invited by counsel for appellant to test the above-described tubes inter partes, which invitation was not accepted. Therefore, the natural presumption that would follow from the refusal to accept the invitation is that the appellee knew that the tubes which failed to operate in the ex parte tests of appellant would not operate had they been tested inter partes.

It was and is the contention of the appellee that the aforesaid tubes, with the exception of the one which did work, were not built in accordance with the disclosure. Appellee contends and strongly urges that the latter tube conformed to his disclosure when it was operated by the appellant using the 1/8″ opening in the closure disc.

The record on behalf of the appellee shows that several tubes were constructed by a witness, an employee of the Raytheon Company, assignee of appellee, in accordance with a sketch said to correspond with the disclosure of said figure 1 of appellee's application, although not drawn exactly to the scale of said figure 1. These tubes were received in evidence. It appears that although the witness received no instruction for the building of said tubes other than the said sketch the thickness of the cathode disc in his tubes was thinner than that constructed by appellant's witness and that it was probably 30 mils in thickness. In any event it was thicker than .010″. The tubes of appellee were tested ex parte and three of them were tested inter partes. It is clear from the record that these tubes did operate successfully. This does not seem to be disputed by appellant.

Appellant contends most earnestly, however, that the tubes built by appellee were not constructed in accordance with appellee's disclosure in that there is nothing contained therein which would indicate that the cathode disc was thinner than that used in appellant's tests, or that there was any relation between the diameter of the aperture and the thickness of the disc. Appellant urges that the bulb temperature must be maintained at a critical stage which is not taught by appellee's application, and that there is nothing contained therein to suggest how the critical temperature may be maintained; and also that the tubes tested could not produce a current of a magnitude comparable to that which could be produced with tubes built in accordance with appellant's disclosure.

Of course the question of commercial superiority has no relevancy. Williams v. Handschiegl, 48 F.2d 395; 18 C.C. P.A., Patents, 1176; Doherty v. Dubbs, 68 F.2d 373, 376, 21 C.C.P.A., Patents, 807, 813. The inter partes tests demonstrated the operability of the device to the extent of 1.5 to 2.0 amperes, which the Examiner of Interferences held to be a range of useful values, and in this finding we cannot say the examiner erred.

Since it appears that the tubes in evidence on behalf of the appellee were constructed by a duly qualified expert, seemingly by using no more than the skill in the art as existed at the time when the application was filed, the operability of the said tubes meets the requirements of the patent law.

There can be no question but that the tubes made by appellant's witness were inoperable, with the exception of the one above mentioned. Likewise, there can be no question but that the tubes constructed on behalf of appellee and subjected to both ex parte and inter partes tests were operable. From the evidence, which is conflicting, the question to be decided must be whether or not the application of appellee, including figure 1 thereof, would enable one skilled in the art to build an operable device conforming to the counts herein.

Both tribunals below held that said figure 1 showed the cathode disc to be of less thickness than the walls of the cup. It was also held that an inspection of the drawing indicated that the aperture of the disc was greater in width than the thickness of the disc. We have examined with care the said drawing of the application together with the enlargement of the same which is before us, and are constrained to agree with the holding of the tribunals below, although, of course, the drawing is diagrammatic.

With respect to the thickness of the disc plate and the width of the aperture therein, we think that the record very fairly discloses that these dimensions are entirely relative. If the disc be thick, the aperture must be wide. With the thinning of the disc the aperture must be relatively narrower.

It was held in effect below that the matter of the aforesaid proportion would be apparent to one skilled in the art, and from the fact that tubes were constructed as aforesaid on behalf of the appellee with nothing to contradict the appellee's evidence that the construction was in accordance with knowledge of the art as it existed when appellee's application was filed, we cannot say that it was not within the knowledge of those skilled in the art to construct the devices which are in evidence as exhibits of the appellee. Therefore, we do not believe that the contention of appellant that the thickness of the disc and the size of the opening are critical is well taken, and we hold that to one skilled in

the art as it existed at the time of filing of appellee's application it would have been apparent to so construct the cathode that the disc and the aperture therein would depend for their dimensions upon the size of the device constructed.

It appears in the record that the tubes constructed by appellee were subjected either to the use of an oil bath or other external heating means during their operation. Appellant earnestly contends that the use of the said heating means was a thing apart from any disclosure shown in the application of appellee and that it would have been impossible to operate the said device without said external heating means. With this contention we cannot agree. While it is true that there is nothing in the application of appellee to indicate that any external heating means was to be used in the operation of the said tubes, nevertheless it has been held by the tribunals below that the external heating was merely a convenient means for ascertaining the temperature of the tube and the consequent pressure of the gas within the tube, and that this was well within the knowledge of those skilled in the art at the time the application was filed. As a matter of fact the following appears by an affidavit of the appellant, with respect to the operation of one of the tubes built by him allegedly in accordance with the disclosure of appellee: "I endeavored to operate this tube not only with the vapor pressure of the mercury at 0.01 m. m. (10 microns) as specified in Smith's application, but throughout the entire range from 1 micron to 100 microns which is specified in counts 1 and 2. * * *"

This, we think, proves, as contended by appellee, that the tube was capable of generating the proper temperature and the mercury pressure specified in counts 1 and 2. Nothing was said in the affidavit as to the manner of securing said pressure and it is our opinion that if appellant had been unable to secure the temperature and pressure specified in the Smith application without going outside the teaching of the specification of appellee as directed to persons skilled in the art there is no doubt he would have so stated in his affidavit.

Moreover, it is pertinent to state that if appellant were convinced, as he now contends, that the external heat was necessary for operation of the tubes, the question could have been readily settled during the inter partes tests by a request from the

appellant that the tubes be operated without the said external heating means. This he did not do.

Under all of the circumstances herein set forth we must agree with the reasoning of the tribunals below. Accordingly, we hold that all the proof adduced justified the board in granting priority to the appellee in Interference No. 66,017, and, therefore, the decision of the Board of Appeals will be affirmed.

Appeal No. 4211—Interference No. 71,931.

This interference was declared as a result of the granting of a motion of appellee under Rule 109 of the Patent Office in Interference No. 66,017. Since the preliminary statement of the appellant showed that the earliest date alleged therein was subsequent to the filing date of the Smith application, appellant was ordered to show cause why judgment on the record should not be rendered against him. Appellant then filed a motion to take testimony on the grounds that appellee had no right to make the claim which is the single count here in issue, for the alleged reason that the Smith device was inoperable to support the count in that the plates of the cathode of the device of appellee were not inherently electron-emitting and that appellee was estopped to make the said claim because he did not present it until more than two years after an alleged public use by appellant.

The Examiner of Interferences denied the motion, and thereupon appellant filed an appeal to the commissioner. In his decision the commissioner stated that appellant did not press his right to take testimony with respect to the said estoppel and the appeal on that ground was dismissed. The commissioner, however, reversed the decision of the Examiner of Interferences and granted appellant the right to take testimony to show whether or not the Smith disclosure would support the following clause of the count: " * * * a thermionic cathode structure having a plurality of oppositely disposed conducting wall members with relatively extended, juxtaposed electron-emitting surfaces bounding narrow spaces therebetween * * *."

The count reads as follows: "An electrical space discharge device comprising a hermetically closed vessel containing an anode, and a thermionic cathode structure having a plurality of oppositely-disposed conducting wall members with relatively extended, juxtaposed electron-emitting surfaces bounding narrow spaces therebetween designed to be heated to thermionic emission during operation, an ionizable gas having during operation a pressure sufficient to sustain a discharge at low voltage drop between anode and cathode, means independent of the discharge for electrically heating said electron-emitting surfaces to a temperature of electron emission, said cathode structure also comprising a hollow enclosure member surrounding said wall members for maintaining said electron-emitting surfaces at temperature of electron emission during operation of the device and simultaneously maintaining the gas between said surfaces at high temperature and excited condition at which a discharge at low voltage drop is secured between said cathode and anode."

The sole issue here is whether or not the testimony shows that the disclosure of appellee was inoperative in accordance with the count.

The device shown by pertinent drawings in the Smith application discloses the conventional glass tube or envelope containing caesium to be developed into caesium vapor, and a cathode and anode. The structure of the cathode is that of a cylinder telescoped over a leading-in support having at its open end a flange which is connected at its periphery to another leading-in conductor. The anode is in the form of a rod or wire extending toward the mouth of the cathode. By connecting the said leads to negative and positive ends, respectively, of a suitable source of potential, the cathode may be heated intensely. The cathode has a series of perforated plates extending across its hollow interior near its mouth. The plates are spaced longitudinally of the cathode.

Several tubes were constructed and were tested by a duly qualified expert on behalf of the appellant for the purpose of determining whether or not the plates within the cathode operated with thermionic emission. It is not necessary, however, to discuss these tubes or the testimony concerning them, for the reason that it affirmatively appears by the testimony of the appellant that the different tests were made at a maximum pressure of only .15 microns, as compared to the 10 microns pressure disclosed in the application of appellee.

For this reason we concur with the holdings of the tribunals below that the tests performed on behalf of appellant were inconclusive to show that the device disclosed by appellee does not support the count.

The record on behalf of appellee shows that both ex parte and inter partes tests were made on his behalf by witnesses who were duly qualified. There is no doubt that the tubes so tested conformed to the disclosure of the application of appellee. Although it is stated in the brief of appellant that a different form of anode from that shown in the drawing of appellee was used and that the anode was spaced considerably farther away from the cathode than is indicated in the drawing of appellee, this alleged difference is not pressed by the appellant. It was testified that in the ex parte tests of appellee the cathode functioned successfully and that during its operation it could be seen that the apertures of the cathode were illuminated, which apparently indicated that electrons were being emitted from the cathode to the anode. A photograph of said tube while so operating is in evidence, and an examination of it shows clearly the said illumination of said apertures. The testimony concerning the building, operating and photographing of the said tube as aforesaid was duly corroborated. Inter partes tests were made of the same tube. During these tests, as during the ex parte tests, the temperature of the tube was raised to 155° C. by means of an oil bath. This temperature corresponds to caesium vapor pressure of 9.5 microns. Since the vapor pressure of caesium is specified as of 10 microns as an example of the pressure at which the tube should be operated, in the application of appellee, the pressure used in appellee's tests was proper. The anode was then raised to a temperature of about 1200° C. as specified in appellee's application. While a careful examination of the testimony shows that at times during the inter partes tests the apertures in the cathode were illuminated and streamers of light came from them, at other times it seems that the apertures were not illuminated and that under certain conditions during the test electrons apparently came from the outside of the cathode. While the tests as a whole might not be considered as satisfactory, nevertheless it is quite clear that it could not be concluded from them that the tube of appellee was inoperative with respect to the involved count.

The testimony shows that in the opinion of one of the witnesses the tube did not uniformly show illumination in the apertures of the cathode for the reason that it was quite fragile and had been handled so much. This seems to us to be a reasonable explanation.

It must be remembered that the burden of proof was on the appellant. Appellee might well have rested his case with respect to the operativeness of his tube upon the testimony of appellant which by no means sustains his contention. Unquestionably, had the evidence of appellee subsequently taken supplied in the record as a whole the deficiency which existed in appellant's case then and in that event priority could not have been awarded to appellee. But there was no burden upon appellee, and his evidence did not show that his tube was inoperative.

■■■■ Appellant contends that the decision appealed from should be reversed, since the Examiner of Interferences stated with respect to the tests of appellee: "* * * Regardless of what conclusions may be drawn from these tests, it is thought unnecessary to go into them here as Hull has clearly failed to sustain the burden of proof imposed on him of showing that the Smith disclosure does not support the count," and the Board of Appeals stated in its decision: "The party Smith also made tests on tubes built but it is not necessary to consider them. * * *"

There can be no doubt but that the entire record was before both of the tribunals below and presumably the entire record was examined by them. We think that if the record made by the appellee showed the tubes to be inoperative the tribunals below should have so stated, and should have awarded priority to appellant. But an examination of all of the testimony shows that the evidence on behalf of appellee does not show that his tubes were inoperative. While there is unquestionable error in the statement of the tribunals below, nevertheless in view of all the circumstances the error was harmless and appellant was not prejudiced thereby, and, therefore, has no cause for complaint.

Appellant also contends that the decision of the board should be reversed because of the immersion of the tube by appellee in

an oil bath. With respect to this contention, we hold that the same reasoning applies as is set forth in this opinion in Interference No. 66,017.

The decision of the Board of Appeals in this interference will be affirmed.

Appeal No. 4212—Interference No. 71,932.

This interference involves two counts which read as follows:

"1. An electrical discharge device comprising the combination of an envelope, an attenuated gas filling at a pressure sufficiently high to neutralize space charge, a cathode therein operating at a temperature at which rectification is dependent upon thermionic emission, said cathode comprising an enclosure of conducting material having a solid material of high electron emissivity in said enclosure, and an anode spaced away from said cathode to permit ionization therebetween, said cathode enclosure having an opening for the passage of electrons to said anode and having closely adjacent walls providing a deep contracted space, whereby said electron emissive material is conserved in said enclosure at a temperature of thermionic emission, the inner surface of the enclosure being at least twice the area of the opening leading therefrom.

"2. An electrode for an electrical discharge device, said electrode having a plurality of adjacent wall members positioned in heat-shielding relation to one another and separated by deep contracted spaces which are open to the exterior, a material on each of said wall members which is relatively non-volatilizable at an effective electron-emitting temperature within said spaces for enhancing the electrical emissivity of said electrode, said electrode being adapted to be heated to a temperature of thermionic emission during operation."

This interference was declared in accordance with a stipulation as to the history of the counts, signed by the attorneys for the parties and appearing in the record, as follows: "The two counts of this interference were presented in a motion to add counts (Motion C) filed by Smith in companion interference No. 66,-017 as counts (a) and (d), respectively. The motion as to these counts was duly opposed by Hull. The Examiner of Interferences held that said counts are not patentable over the prior art and, there-fore, denied the motion but overruled Hull's other grounds of opposition. The Board of Appeals in its decision rendered July 24, 1935 reversed the decision of the Examiner of Interferences holding said counts unpatentable. This interference was thereupon declared between the Hull application and Smith application, Serial No. 88,558."

Here, as in the preceding interferences, it is contended by the appellant that the involved application of appellee fails to disclose a tube operable in accordance with the counts. Appellant also contends that the structure of the tube disclosed by appellee fails to correspond with the structure as specified in the counts.

Other questions, such as that of the parties' relative invention dates, were before, and were decided by, the tribunals below, but appellant makes no contention before this court as to the said dates, so that the issue here pertains only to the two points above stated.

The structure contained in the application of appellee shows a tube roughly in the shape of the ordinary incandescent lamp, preferably formed of glass and containing a cathode and two anodes. The cathode, it is stated in the application, is formed into two parts, the upper part being in the form of an inverted cup with an exterior flange around its mouth and the lower part being in the form of a disk secured to said flange as by welding. The disk has two anode openings, with flanges therearound preferably being spaced from the anodes a distance less than or comparable to the mean free paths of ions or atoms in the gas which is contained in the said tube. Each anode comprises a metallic tube having a lead-in wire extending therethrough. The lead wires are surrounded by insulating sleeves. The two anodes protrude through the said openings in the disk. Inside of the said cathode, as shown in figure 1 of the application of appellee, there are several metal rings parellel to the horizontal top of the cathode, each having central openings that are in alignment with each other to permit the discharge to pass between the respective rings and the anodes. These rings may be formed of material such as tungsten, which withstands extremely high temperatures, although under many conditions of operation they may be made of nickel or even iron. The space between the rings may

vary considerably, but when operating at a pressure of the order of 17 mm. the spacing is preferably of the order of 2 mm., which is approximately the mean free path of the gas.

The application states: "* * * The rings may be caused to emit more efficiently if they are coated with an alkali metal or an alkali earth metal. * * * The hollow cathode may also be similarly constituted. * * *"

The application further states (omitting figures and letters): "* * * The plate surfaces inside the cathode become highly heated by the discharge owing to the fact that they are enclosed by the cathode and are spaced close together and close to the wall of the enclosure; consequently these surfaces function as thermionic electron-emitters with marked efficiency and most of the electronic discharge emanates therefrom rather than from the interior of the enclosure. *Thus the enclosure need not be formed as part of the cathode. * * *"* (Italics ours.)

The points raised in this appeal were considered exhaustively and at great length by the Examiner of Interferences in his decision, but in view of our conclusion it will not be necessary to discuss the record in detail.

Several tubes were made and tested ex parte by both parties and there were inter partes tests of one tube offered on behalf of appellee.

Appellant contends that the tubes built by appellee were not in accordance with the disclosures of appellee's application. Appellant argues that there is no teaching in said application for making the disk in the tubes of a thickness of the order of 3 or 5 mils, as was done. It is quite true that the specification of appellee does not indicate the thickness of the disks, but it will be noted, as hereinbefore mentioned, that they were intended to be constructed so that they could be readily heated.

We are in agreement with the lower tribunals that it would be obvious to anyone skilled in the art in constructing the said device to make the disk of such a thickness that it could be readily heated to proper temperature, and it is clear to us that disks of thin material having this property would be selected. It further appears in the record that the tubes were constructed using only the knowledge available to one skilled in the art at the time the application of appellee was filed. This has not been contradicted and we see no reason, as was held by the Examiner of Interferences, for not believing this testimony. Hence, we are of the opinion that the said tube which was tested inter partes fairly responds to that shown in the application of appellee. This tube operated successfully in the inter partes tests carrying a rectified load current of from ½ to 1 ampere, and therefore we must hold that the said device operated in accordance with the counts.

Appellant earnestly contends that the tribunals below erred in holding that it was not necessary to consider the cathode enclosure in its entirety and in holding that the cathode enclosure could be considered as being formed by the upper portion of the cup (cathode enclosure), cooperating with the lowermost ring. When the said enclosure is so considered there can be no doubt that there is an opening in the lowermost ring for the passage of electrons from the cathode to the anode and that the anode is spaced away from the cathode. It is also clear under this construction that the electron-emissive material would be conserved in the said enclosure with very little waste. The board held: "* * * It seems to us that when the language of the count is given its broadest meaning the count will fairly read on the Smith disclosure."

We can see no error in this holding by the board, particularly in view of the statement in the application of appellee that: "* * * Thus the enclosure need not be formed as a part of the cathode, * * *" which has been heretofore set out.

The decision of the Board of Appeals succinctly sets forth the tests and the results thereof shown in the record for the appellant, as follows: "* * * Several tubes were built by Peabody, a witness for Hull, and one of these tubes, exhibit 6, was tested by DuBridge. The record of the test has been introduced as Hull exhibits 22 and 22a. The record shows that on innumerable occasions an arc-back occurred which opened the circuit. It is therefore contended that the device would not operate. The tube, however, did operate on various occasions for considerable periods of time up to about twelve minutes before an arc-back occurred (p. 55, Q. 95). Other tubes were also tested with

similar results. DuBridge observed that the voltage drop was 40 volts throughout the test and did not vary, and he therefore concluded that the tubes did not operate by thermionic emission. He stated however that at a temperature of dull red heat which was the temperature of the tubes after ten minutes, it was possible that there was some thermionic emission from the cathode (p. 57, Q. 109). Accordingly, the test did not appear to prove conclusively that the tubes built according to the Smith disclosures will not operate."

Appellant contends that the tube tests on his behalf disclosed that the operation was merely that of a glow discharge which required voltages of 1 to 50 volts or higher, depending upon the nature of the cathode surfaces and that rectification was shown to be not dependent upon thermionic emission. Concerning this contention the Examiner of Interferences stated as follows: "It is not thought that the limitation, 'a cathode therein operating at a temperature at which rectification is dependent upon thermionic emission,'" precludes some ionic bombardment of the cathode contributing to the discharge but that it merely means that the cathode is heated to a temperature at which electron emission becomes an important or material factor in supplying the electrons to carry the discharge and in which the cathode is maintained at a temperature of thermionic emission by the discharge so that the initiation of the discharge at each cycle is not dependent upon ionic bombardment with its consequent high starting voltage."

It is not necessary to prolong unduly this opinion by any further discussion. It is very plain to us that the aforesaid exhibit of appellee, tested inter partes, responds to the structure contemplated in the appellee's application. This, together with the fact that the record amply shows that the tube operated by carrying a rectified load, is sufficient to convince us that the counts herein read upon the application of appellee and the decision of the Board of Appeals, accordingly, will be affirmed.

For the reasons herein stated, the decision of the Board of Appeals in each of the appeals before us, numbered 4210, 4211 and 4212, is affirmed.

Affirmed.